**FULTON CO. v. BISHOP & BABCOCK CO.**

(District Court, N. D. Ohio, E. D.
February 13, 1925.)

No. 726.

**1. Patents ⊚=36(2).**

Where new process is widely used, has supplanted previous devices, and has commercial success, inferences favor validity.

**2. Patents ⊚=328.**

Fulton patent, No. 971,838, for process for making flexible corrugated metal walls for collapsible and expansible vessels, *held* valid and infringed.

**3. Patents ⊚=66(1).**

Prior patents are part of prior art only by what they disclose on their face.

**4. Patents ⊚=52.**

Prior accidental production of same thing, where the character and function are not recognized until the later patent, does not effect anticipation.

**5. Patents ⊚=65—Anticipation is not disclosed by drawings which only show similar arrangement of parts, where such arrangement is not essential to first invention.**

Anticipation is not disclosed by drawings which only show similar arrangement of parts, where such arrangement is not essential to first invention, and was not adopted and used to perform function it performs in second invention, especially when first patent contains no suggestion of way in which result sought is accomplished by second inventor.

**6. Evidence ⊚=19.**

It is common knowledge with all metal workers that cold working of brass or other metal will temper it and produce toughness and resiliency.

**7. Evidence ⊚=19.**

It is common knowledge that annealing metal will remove greater part if not all of temper or toughness worked into it, thereby restoring its normal plastic condition.

**8. Patents ⊚=328.**

Fulton patent, No. 947,229, for metal bellows, known by trade-name "Sylphon," *held* not infringed.

**9. Patents ⊚=312(1).**

Burden of proof is on patentee claiming infringement.

In Equity. Patent infringement suit by the Fulton Company against the Bishop & Babcock Company. Decree in accordance with opinion.

Decree modified and affirmed 17 F.(2d) 1006.

Mauro, Cameron, Lewis & Kerkam, of Washington, D. C., and Bates, Macklin, Goldrick & Teare, of Cleveland, Ohio (L. H. Sutton and W. B. Kerkam, both of Washington, D. C., of counsel), for plaintiff.

Fay, Oberlin & Fay, of Cleveland, Ohio (John F. Oberlin and Horace B. Fay, both of Cleveland, Ohio, of counsel), for defendant.

WESTENHAVER, District Judge. This suit is based on United States letters patent 947,229, issued January 25, 1910, and 971,838, issued October 4, 1910, both to Weston M. Fulton. All claims of both patents are in issue. The defenses are invalidity for various reasons and noninfringement.

[1] Patent 971,838 is for a process; 947,229 is for the product. The latter is narrowly limited and is of minor importance; hence the process patent will be first considered. The process as described by the patentee is one for the making of flexible corrugated metal walls for collapsible and expansible vessels. The product is known in industry by the trade-name of Sylphon. It is commonly referred to as a metal bellows. While the patent process is not limited as to the metal, it has, so far as the record shows, been used so far only in working brass, chiefly what is known as low brass; i. e., copper with a 20 per cent. zinc alloy. The process begins by forming a thin-walled tube, and is completed with the wall so deeply corrugated that the shoulders of the outer and inner bends come in contact on compression. In its finished condition, the bellows is highly resilient and practically indestructible under any conditions of known use. It is highly sensitive to changes of temperature, and widely used in thermosensitive and pressure-sensitive devices. It is so widely used, has supplanted so many previous devices, and has had such commercial success, that all legitimate inferences flowing therefrom are to be weighed in favor of validity.

[2] The elements or steps of the process are: (1) Forming of a thin-walled tube; (2) forcing the metal outward to form broad corrugations, leaving intervening uncorrugated portions; (3) successively deepening and narrowing the corrugations; (4) subjecting the metal at the bends to rolling operation or pressure to toughen and temper the curved portions. The width of the outward corrugation is not definitely stated, but an uncorrugated intervening portion is called for in all the patent claims, and in some a narrow uncorrugated portion. The number of successive deepening and narrowing operations is not definitely stated, but it is clear that each successive one is to both increase the depth and shorten the radius of the cur-

vature. The extent or degree of toughening and temper is not specifically stated, but it is clear that a high degree of flexibility or resiliency and toughness is and can be obtained by the bending and stretching of the curved portions during the successive rolling operations. This toughening and tempering results from what is known in the metal working art as cold working.

Defendant contends that this process, if not anticipated by the prior art, is so far disclosed therein that no invention is present or that the claims must be so limited thereby that infringement is not shown, and also that the patent disclosures are so vague and indefinite as not to disclose how the product may be produced by practicing the process.

The prior art consists exclusively of certain American and British patents, supplemented by the admitted fact that cold-working of metal will impart to it temper and toughness. The evidence shows without dispute that, when Fulton entered the field, highly flexible, collapsible, and expansible metal walls or bellows were not known in the industry. Any articles of that configuration, such as are disclosed in drawings of Graham & Creelman, 350,881, and considered in Fulton Co. v. Bishop & Babcock Co. (6 C. C. A.) 284 F. 774, were of the built-up variety; i. e., made by brazing together the inner and outer peripheries of circular curved metal strips. In the thermo and pressure control art, the only other forms of device in common use were a carbon post, rubber diaphragm, float traps, and similar makeshifts. Fulton realized the desirability of a metal bellows having the described qualities; in fact, such desirability was disclosed to him by some work in which he was then engaged. He made diligent search to find it in the market. He solicited numerous firms highly skilled in manufacturing articles from brass, to construct one for him, but without avail. He gives a convincing and vivid account of this search and of his subsequent experiments by which his process was developed. His testimony is fully corroborated. It must be found that he was the first to produce an article having the characteristics and advantages described in his patent and admittedly present in the structures in controversy.

His original patent application was one for both product and process. The Patent Office insisted upon a division and that a divisional application be filed for the process. The five claims of the process patent were lifted bodily from the original application. The drawings and specifications are precisely those of the original application, some parts of which were required by the Patent Office to be eliminated from the original application as not applicable to the product patent. No difficulty was experienced in the prosecution of the original or the divisional application. The last clause only of claim 1 of the process patent was slightly amended. The remaining claims were amended only by the insertion of the word "swaging" at the suggestion of the Patent Examiner as a more exact definition of what takes place during the rolling operations required to deepen and narrow the corrugations. No art was cited and no rejections made and acquiesced in which impose any limitations upon the claims.

Of the printed art cited on this hearing, that mainly relied on was Webster, British patent 825 of 1856; Blair & Birrell, 17,356, of 1889; and American patents to Daelon, 266,976, and Zeh, 784,244. Since these are the only ones stressed in oral argument or in defendant's brief, the others may be briefly disposed of. Morrison, 142,929, Bancroft, 179,761, and Brombacher, 200,689, are merely beading machines for forming the joints on ends of stovepipes. Of these Brombacher is the best illustration. Graham & Creelman, 350,881, and McCloskey, 398,325, show merely the uses to which a flexible metal bellows could be put in devices for recording pressure or temperature or to avoid packing in valves, if any such article had been in existence or could be produced by any known process. They teach nothing as to how such an article might be produced. All other art not specially mentioned is even more remote.

Webster, 825, of 1856 is perhaps the oldest and certainly the most interesting. He undoubtedly had Fulton's concept as to the product. He describes it as "a tube made of brass, copper, or other metal or alloy, in which a series of corrugations is made in planes perpendicular to the axis of the tube." He says he prefers to make the corrugations "as deep as is compatible with the nature of the metal or the alloy of which the tube is made and so narrow that the shoulders between the corrugations should touch each other on slight flexure of the tube." He realized also the effect of cold-working metal. He says, "Tubes made according to my invention are elastic, both longitudinally and transversely; that is to say, they are capable of elongation and flexure within

certain limits without taking a set." However, the problem he was trying to solve was different from Fulton's. Webster had in mind the corrugation, not of thin-walled, but of substantially thick-walled, tubes, and the evidence makes it clear that the problems are essentially different. His corrugated tubes were intended to be used as expansion joints, as in couplings of locomotives with their tenders, hose for fire engines, and other like purposes. More important still, the means disclosed for practicing the process are not Fulton's means. Nor are they operative or practicable means. No interior support or die roll is provided. He provides three exterior single rolls spaced about the tube, with the tube or pipe rotating therein. It is not practicable to corrugate by these means in any manner or to any extent thin-walled tubes such as are worked by Fulton's process, being only .005 to .008 of an inch in thickness. In an annealed condition, as they are at the beginning of the process, tubes of this thickness have as little resistance against wrinkling or crumpling as stiff paper. Even if it were practicable by Webster's means to corrugate tubes having walls thick enough to furnish their own interior resistance, it would still not be possible so to do to an extent so deep that the shoulders of the corrugations would touch on slight flexure.

No evidence is offered that Webster's process was ever practiced or that any tubes or pipes were ever corrugated by it, having the characteristics claimed by Webster for the resultant product. So far as appears, he did nothing to advance the art. In Blair & Birrell, 17,356, of 1889, is a significant statement as to the condition of the art tending to show the contrary. In 11. 15–18, p. 4, of the complete specifications, Blair, describing his three exterior rolls as useful in bending or curving metallic tubes or pipes, says this may be done "either out of the solid shell when they have strong walls to sustain this, or by filling them first with lead, rosin, or other soft or yielding material when the shell or wall of the tube is not strong enough to stand bending without this."

Blair's place in the art is, I think, correctly stated by plaintiff's expert, F. L. O. Wadsworth. (tr. pp. 375–380). Blair is for a machine which may well be described as massive. It was designed to operate on heavy thick pipe and to produce a product available for expansion joints in pipe lines subject to changes of temperature whereby rupture at the connecting joints might be avoided as a result of the limited come and go due to changes in temperature. He nowhere discloses that he had even Webster's concept as to the process or product involved in producing a highly flexible, deeply corrugated, tubular metal wall. He does not contemplate any initial forming of outward corrugations separated by uncorrugated portions. He does not contemplate deepening and narrowing of these corrugations by rolling operations or swaging pressure, except perhaps to an extremely limited degree, not involving the advantages or realizing the results of Fulton's process or product.

Daelon is primarily a plate curving or bending and corrugating machine. The plate is fed between an upper and lower gang of rolls or dies, the center one of which is stationary, and the others are designed, as they revolve, to travel inwardly towards the center roll or die. As the plate starts through, all except the center roll starts to travel inwardly towards the center, and the upper and lower gangs are brought nearer and nearer together. The result is that at the beginning edge of the plate, the corrugations, if they may be so called, are much shallower and farther apart than at the concluding edge. The next operation is by reversing the rolls and passing the plate back in the reverse direction. The final steps of the process contemplate passing the plate back and forth after the corrugating rolls or dies have reached the limit of their inward movement. This method is admittedly practicable for corrugating a plate or sheet, but I am convinced, for the reasons stated by Mr. Wadsworth, that it would be utterly inoperative in corrugating any kind of tube, and still more so for corrugating a thin-walled tube. If it were practicable to remove the end post and otherwise change the machinery so as to insert a tube over the upper gang of rolls or dies, as is claimed by Daelon, the result would be a failure of the corrugations to register at their meeting ends after each revolution, and the metal would be drawn towards the center in an indistinguishable mass. As a matter of fact, Mr. Wadsworth says this is what actually happened when a machine constructed intelligently was operated on a tube. Moreover, no evidence is offered that a Daelon machine was ever used to corrugate any kind of tube.

Zeh is a machine for screw-threading sheet metal pipes such as are used in making corrugated stovepipe elbows. It has no other avowed purpose. It does not appear that

it could accomplish any other result. All the corrugations are directed inwardly towards the center of the pipe, and the operation is always the spiral or screw principle. No suggestion is made, as in Webster, that the corrugations are or may be successively deepened and narrowed until their shoulders would touch on slight flexure, or that elasticity or resiliency are or could be obtained by working the metal.

This patent art is not aided by any proof of prior use or trade practice, unless it be the common knowledge of metal workers that cold working imparts temper and toughness. The patent, ll. 35–48, p. 1, refers to a prior practice of making flexible, corrugated, tubular walls by avoiding working temper or toughness into the metal and by removing it by repeatedly annealing the metal. Fulton testifies that he knew of no such prior art, but had repeatedly attempted, during his experiments, to accomplish the desired result in that way, having in mind the configuration of a Japanese lantern or a folding camera bellows made of paper or rubber. Defendant insists that he is estopped to controvert the disclosures of his patent as to the prior art in this respect. But I deem it unnecessary to decide this question or pursue the inquiry, because all the witnesses agree that a flexible metal bellows of any description was unknown in the industry, and the advance over one thus described is so distinctive that the quality of invention would not thereby be negatived. [3-5] This art, and all that can be claimed for it, is not adequate to show anticipation or to deprive Fulton's means, considered merely as a mechanism, of the quality of invention. This results from settled rules for appraising the prior art, established by numerous decisions. Prior patents are part of the prior art only by what they disclose on their face. Prior accidental production of the same thing, where the character and function are not recognized until the later patent, does not effect anticipation. Anticipation is not disclosed by drawings which only show a similar arrangement of parts, where such arrangement is not essential to the first invention and was not adopted and used to perform the function which it performs in the second invention, especially when the first patent contains no suggestion of the way in which the result sought is accomplished by the second inventor. Fulton Co. v. Bishop & Babcock Co. (6 C. C. A.) 284 F. 774, 777, and cases cited.

The patent in question, however, is not for a mechanism, but for a process, and the range of pertinent inquiry is narrower. As was said by Mr. Justice Brown in Carnegie Steel Co. v. Cambria Iron Co., 185 U. S. 403, at page 422, 22 S. Ct. 698, 706 (46 L. Ed. 968):

"A process patent can only be anticipated by a similar process. It is not sufficient to show a piece of mechanism by which the process might have been performed."

Again, at page 424, 22 S. Ct. 707, he says:

"Granting that some of these devices may have been made use of to carry out Jones' process, none of them in practical operation seems to have been effective to secure the desired result. A process patent * * * is not anticipated by mechanism which might with slight alterations have been adapted to carry out that process, unless, at least, such use of it would have occurred to one whose duty it was to make practical use of the mechanism described."

The legal patent art of adjudged cases is more than crowded; it is packed, if not jammed. Every consideration here urged to invalidate or limit Fulton's patent has been adequately dealt with and shown to be ineffective for that purpose in Carnegie Steel Co. v. Cambria Iron Co., supra; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279; Eibel Co. v. Paper Co., 261 U. S. 45, 43 S. Ct. 322, 67 L. Ed. 523; Loew Filter Co. v. German-American Filter Co. (6 C. C. A.) 164 F. 855, 90 C. C. A. 637. An application of the principles of these cases compels the conclusion that the prior patent art does not invalidate Fulton's patent, either by anticipating it or depriving it of the quality of invention.

[6, 7] Nor am I impressed with the objections that his patent disclosures are vague or indefinite and do not teach how his process may be practiced by one skilled in the art. It is urged that the expression "a thin-walled tube" is too indefinite, that no yardstick is furnished to measure "broad corrugations" or "intervening narrow portions," and that no measure is furnished whereby a sheel metal worker can determine when the required degree of temper and toughness is reached. It is common knowledge with all metal workers that the cold-working of brass or other metal will temper it, thereby producing toughness and resiliency. It is also common knowledge that annealing metal will remove the greater part if not all of the temper or toughness worked into it, thereby restoring its normal plastic condition. It is perhaps not true, as stated by

Fulton, p. 4, 11. 58–66, that the flexible tubular wall, if annealed at the end of the cold-working process, would still possess to a very high degree the toughness and tensile strength imparted to it by the process, and that these qualities would be distributed in the curved portions and the portions of the lateral walls adjacent to the ends of the curves. His testimony is that the wall still remained quite flexible, but was not tough and was easily ruptured. Even so, Fulton has experienced no difficulty in practicing his process or producing the required degree of temper and toughness. Nor does it appear that any one else skilled in the art experienced any difficulty in following it. The common knowledge of the effect of cold-working and annealing metal and the common sense of the skilled metal worker desiring a product having the configuration and general characteristics of Fulton's metal bellows, have seemed adequate to apply the process.

Defendant, it appears, passes its tube through the corrugating rolls so many times that it is over-tempered, and then subjects it to annealing and again passes it through the corrugating rolls a sufficient number of times to produce a tubular metal bellows having the desired characteristics. Nothing appears to indicate that ordinary skill is not adequate to detect the effects of excessive cold-working or to pursue the process successfully through to the desired result. Likewise as to the width of the corrugations or of the uncorrugated portions. The essence of Fulton's invention does not inhere in the width of either one. It is the strengthening effect upon the thin-walled tube imparted by forming the first corrugation outwardly which is of primary importance, otherwise the respective widths of the two portions after the first operation have relation only to whether it is desired to make the greater depth of corrugations inwardly or outwardly from the original diameter, thereby subjecting one or the other to a greater or less amount of cold-working. Likewise as to the thickness of the tube wall. Obviously that wall must be substantially thin, otherwise the means prescribed by Fulton for practicing his process would not be practicable. Thin means thin and nothing else, but no difficulty is perceived why a skilled worker may not readily determine for himself the limits of thinness or of thickness beyond which in either direction the process would not be practically operative.

These criticisms are familiar in the patent law. They have been adequately dealt with in many cases. See Tilghman v. Proctor, supra; Carnegie Steel Co. v. Cambria Iron Co., supra; Eibel Process Co. v. Minnesota Paper Co., supra; Loew Filter Co. v. German-American Filter Co., supra. It is not too much to say that an attentive reading of the Carnegie Steel Co. Case will show that every consideration here urged, whether resting upon the disclosures of the prior art or prior uses or vagueness and indefiniteness of the specifications, was urged, duly studied, and held insufficient to invalidate or limit the invention. The showing made against Fulton's patent in this case is much less impressive. In that case the essential elements of the process inhered in the capacity of the mixing vat and in leaving a considerable amount of molten metal therein whenever it was emptied. A claim thus indefinitely phrased was not only held sufficient, but the danger was pointed out of leaving a loophole for infringement if the specification of size and quantity were made too definite. In Eibel Process Co. v. Paper Co., the essential improvement in the paper-making process consisted in raising the breast roll end of the paper-making wire so as to speed up the travel by gravity of the material passing over it. The claims described this element as a "substantial elevation" or as a "high elevation," and these terms were held to be sufficiently definite. In Tilghman v. Proctor, a claim was sustained which called for the action of water at a high temperature and pressure, as against objection that neither the degree of temperature nor the amount of pressure was sufficiently disclosed.

The defense of noninfringement is not strenuously urged. Fulton's patent is entitled to rank as a pioneer or primary patent and to have the range of equivalents accorded to patents of that class. He produced an article of commerce hitherto unknown. The process by which he did so had never before been successfully practiced, although its desirability was pointed out by Webster in 1856. His labors may be said, not only to have answered the problem, but to have ended the search. He has founded an art. His product has gone into extensive use, supplanting other previous devices known to be inefficient. It has supplanted the carbon post and the rubber diaphragm. If the built-up tubular wall still keeps a place in the field, it is only in the cheaper kind of construction. It is the only satisfactory

and efficient thermo-sensitive and pressure-sensitive device. Not only has it supplanted other devices, but it has found many new uses, as in depth bombs, submarine mines, torpedoes, airplanes, and automobiles. It has been sold and is used by hundreds of thousands to control the flow of steam in steam-heating lines, to open and control automatically the valves of steam-heating radiators, to ventilate buildings, and to control the operation of refrigerating machines. It is practically indestructible under any known conditions of use. The testimony to this effect is voluminous, uncontradicted, and most convincing. For the range of equivalents to which a primary or pioneer patent is entitled, see McSherry Mfg. Co. v. Dowagiac Mfg. Co. (6 C. C. A.) 101 F. 716, 41 C. C. A. 627; Eibel Process Co. v. Minnesota Paper Co., 261 U. S. 45, 63, 43 S. Ct. 322, 67 L. Ed. 523.

The several claims do not differ sufficiently to require separate discussion. Swaging pressure is called for in claims 2, 3, 4, and 5 instead of a rolling metal operation, as in claim 1. A narrow uncorrugated portion is called for in claims 1, 3, and 5. Annealing of the tube after it is formed is called for in claims 4 and 5. But the fundamental elements or steps already stated are to be found in all the claims, and no nice questions of construction need be considered. Defendant uses the process on a thin-walled tube. It anneals this tube after it is formed and before the first step is taken. Its next step is to form outwardly corrugations of greater or less width. In doing so, it does not use the precise means prescribed by Fulton, but in a process patent it is necessary to prescribe only one means for practicing the process, and that need not necessarily be the best means. Defendant next deepens and narrows the corrugations by successive rolling operations. The curved portions or bends of the corrugations are subjected to the greatest amount of stretching and bending or rolling and swaging. The temper and toughness created by successive working is carried, as the curvature of the bends is narrowed, into the lateral walls adjacent to the ends of the curves. Plaintiff has always used on small-sized tubes three successive deepening and narrowing rolling operations, and on the larger sizes always four such operations. Mr. Patton, now a disinterested witness, testifies that defendant began its operations while he was employed by it and under his supervision, and that, during the term of his employment, defendant practiced the process in precisely the same way. Defendant's witness Zimmerman testifies that, after the first three rolling operations, the small-sized tube (Defendant's Exhibit 1) is subjected to annealing in order to remove the temper or hardness, and that it is then again subjected to three successive rolling operations to narrow and deepen the corrugations and impart toughness and temper. These are precisely the same operations as are performed by plaintiff on the same sized tube after the tube is first annealed. What defendant does with tubes of the larger size is not made to appear. Zimmerman also says that the tubular metal wall is subjected to a manual collapsing operation and later to a truing-up operation by being run through gang rolls.

These additions and variations, if such they be, in the manner of practicing the process, do not avoid infringement. The additional annealing step is clearly within Fulton's teachings. In ll. 49–58, p. 2, Fulton points out that this intermediate step may be used. Moreover, the introduction of such an additional step as annealing, having the obvious purpose of eliminating excessive hardness, is of no significance. Whether defendant's initial outward corrugations, even if broad, are narrower than the intervening uncorrugated portions of the tube, is in dispute. Even if defendant is right, infringement is not thereby avoided. Claims 2 and 4 are not so limited. But the important function of forming outwardly the initial corrugations does not flow from the width, but from the strengthening and stiffening effect upon the thin-walled tube, so that the succeeding rolling operation between an inner die roll and an outside matrix roll may be effectively performed without crumpling or distorting the tube. In my opinion, all the claims of 971,838 are valid and infringed.

[8] Product patent 947,229 is narrowly limited. If valid, it is conceded that its claims are not infringed, unless the bends of the outer corrugations are toughened and tempered in excess of the inner bends. This limitation upon all three claims was imposed by the Patent Office in order to avoid prior art, and was accepted and acquiesced in by Fulton. It is contended that the bends of defendant's product, if not equally tempered and toughened, are more so as to the inner bends. Obviously, a determination of this question is exceedingly difficult. The larger part of the oral testimony was di-

rected to it. Tests were made by experts of the highest attainments, acting in undoubted good faith, but still the facts are in confusion. It may be possible to determine whether the outer or inner corrugations have been worked to the greater depth from the original diameter of the tube. This would tend to indicate that the bend worked to the greater depth would be tempered to the greater degree. In the happy phrase of one expert, the greater plastic deformation of the metal would take place in the bend worked to the greater depth. It is assumed by Fulton, and it is testified by Patton, that temper and toughness are synonymous, but this assumption seems to me not to be supported. The temper may be carried to a point where the metal ceases to be tough and tends to become brittle. In practicing the process, the work is not done under laboratory conditions, nor with such precision as to justify a finding that one bend has more temper or toughness than the other. If the uncontradicted testimony of William C. Armistead on this point is to be accepted, plaintiff does not, in its factory, take any note of the difference in toughness and temper as between the inner and outer bends, nor vary its methods depending upon whether the bellows in use is to be subjected to pressure from without or from within. It would appear that plaintiff's product is produced uniformly by the same process and sold and used indiscriminately as a standard article of commerce.

Plaintiff's expert, Mr. Wadsworth, apparently demonstrated by his bending tests that there was greater resiliency in the outer bends of defendant's product. It is also probably true that its outer corrugations are deeper than its inner corrugations, and inferentially, therefore, that the outer bends are subjected to more rolling operation or swaging pressure or cold-working than the inner bends. The efforts to carry the proof further, however, seem to me to fail utterly. Mr. Jeffries' criticism of Mr. Bezzenberger's micrographs seems to me to be sound. But as to the point at which, under test, the walls first rupture, the evidence is in grave conflict. If I should accept Mr. Wadsworth's testimony as true, that the rupture in his tests was always at the junction of the ends of the inner bends with the lateral walls, it still does not follow that there was less toughness and temper on the inside than the outside. The tensile and compression strains under test, the distribution of stresses and strains inherent in the metal, the variations in the thickness in the tubular wall, both at the beginning and at the end of the process, and the varying forces present during the repeated flexures of each test, are sufficient to upset any train of inference.

[9] The burden of proof is on the plaintiff. It does not seem to me that it is sustained by a preponderance of the evidence. My conviction is clear that the burden is one which is not susceptible of proof by a preponderance of the evidence. The experts were working on the margin of infinity. Too many disturbing factors are always present to justify more than a possibility that the toughness and temper are greater in one bend than in the other. Moreover, it is doubtful if any utility can be claimed in a metal bellows having the characteristics of Fulton's product for greater temper and toughness in the outer over the inner bend. The temper and toughness in all the product is such that it is practically indestructible under any known conditions of use. As testified by plaintiff's highly qualified expert, F. Paul Anderson, he had repeatedly tested the same much beyond the life of a heating or ventilating system without finding any signs of failure.

A decree in conformity herewith will be entered, sustaining the validity and finding infringement of all five claims of patent 971,838, and noninfringement of patent 947,-229. An accounting of profits and damages will be ordered. Inasmuch as not less than one-half the testimony was directed to 947,229, no judgment for costs to this stage of the case will be entered in plaintiff's favor, but each party will be required to pay its own costs.