PETROLEUM RECTIFYING CO. OF CALIFORNIA v. REWARD OIL CO.*

(Circuit Court of Appeals, Ninth Circuit. August 4, 1919. Rehearing Denied October 14, 1919.)

No. 3219.

1. PATENTS ☞328—INFRINGEMENT.
    The Cottrell and Speed patents, Nos. 987.115 and 987,116, for a process and apparatus for separating and collecting particles of one liquid suspended in another, *held* valid and infringed.
2. PATENTS ☞157(3)—CLAIMS—CONSTRUCTION.
    The term "short circuiting" in a patent claim, if susceptible of two meanings, should be given the meaning which the specifications show it was intended to have, if that meaning is not repugnant to the terms used.
3. PATENTS ☞157(2)—CONSTRUCTION.
    A pioneer process patent, which has been extensively used, should receive a fairly liberal construction to uphold it.
4. PATENTS ☞328—CLAIMS—"SHORT CIRCUITED."
    The term "short circuiting," as used in Cottrell and Speed patents, Nos. 987,115 and 987,116, for separating and collecting particles of one liquid suspended in another by electricity, means a total short-circuiting, and not a succession of minute short circuits.
5. PATENTS ☞118—PROCESS—SETTING OUT SCIENTIFIC BASIS.
    It is not essential that patentees should either understand or set forth the scientific principle on which the patented process operated.
6. PATENTS ☞253—INFRINGEMENT.
    A defect in a patented process cannot be predicated upon defects in a patented apparatus intended to apply the process, nor is the fact that the patentee's first apparatus was defective any reason for denying protection to a subsequent apparatus.
7. PATENTS ☞253—INFRINGEMENT.
    The defendant's infringement of plaintiff's process is not excused by the fact that defendant's apparatus is distinctly superior to plaintiff's apparatus.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Jeremiah Neterer, Judge.

Suit by the Petroleum Rectifying Company of California against the Reward Oil Company. From a decree dismissing the bill, plaintiff appeals. Reversed and remanded, with directions.

John H. Miller, of San Francisco, Cal., F. P. Fish, of Boston, Mass., and J. H. Brickenstein, of Washington, D. C., for appellant.

William K. White, of San Francisco, Cal., for appellee.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

GILBERT, Circuit Judge. The appellant brought suit in the court below for infringement of patents. Upon the issue of infringement that court found for the appellee and dismissed the appellant's bill.

The appellant is the assignee of patents granted on March 21, 1911, to Cottrell and Speed, numbered, respectively, 987,115 and 987,116, the first of which is for the process of separating and collecting particles of one liquid suspended in another liquid, and the second is for apparatus by which the process is carried out. The invention

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
·For opinion below, see 260 Fed. 183. Certiorari denied 250 U. S. —, 40 Sup. Ct. 119, 64 L. Ed. —.

relates to the elimination of water from crude petroleum as it comes from wells. The specifications say:

"There is a large class of oils that cannot be economically freed from water without distillation. These are largely oils in which the water is in very small globules, often less than one-thousandth of an inch in diameter, and behaving as if surrounded with a membrane resisting coalescence of the drops. * * * Many natural petroleums as taken from the wells contain from ½% to 50% of water in the form of small drops (i. e., emulsions), and after being allowed to stand for months still hold a great proportion of the water in suspension."

The specifications go on to say that the inventors had found that, when these emulsions are subjected to the action of high potential electric charges in the manner thereinafter described, they are rapidly de-emulsified, the water settling to the bottom of the vessel, collecting into large masses, which can be readily withdrawn, leaving the oil dry.

The process involved in the invention, as shown by the specifications, is substantially this: Oil loaded with water in the form of minute globules is passed between two electrodes separated at a proper distance, the electrodes being connected to a source of electricity of sufficiently high potential to create between the electrodes an electrostatic field, or field of electric strain, which will cause the minute globules of water to conglomerate and coalesce until they become so large that they will settle out from the oil by gravity. For present purposes it is sufficient to quote the first claim:

"The improvement in the art of separating and collecting particles of one liquid suspended 'in another, which latter is essentially a nonconductor of electricity, consisting in bringing the material to be treated between electrodes connected to a source of electricity of sufficient voltage to produce coalescence of the suspended particles in such wise as to cause the rapid separation of the two liquids throughout the body of the mixture, and at the same time prevent the coalescing globules from forming complete chains, short-circuiting the electrodes."

The appellee, operating under a patent issued October 26, 1915, No. 1,158,253, for "Process of Dehydrating Oil," removes the moisture from oil by passing the oil between electrodes connected to a source of electricity of sufficient voltage to cause the suspended particles to coalesce in such wise as to produce rapid separation of the two liquids throughout the body of the mixture. But the appellee contends that it does not infringe the appellant's patent for the reason that it does not prevent the coalescing globules from "forming complete chains, short-circuiting the electrodes." Therein is the whole ground of controversy in the present suit. In both processes there are the electrodes, the sufficiently high voltage to produce coalescence of the moisture, and to separate the same from the oil. The only question is whether the operations involve different methods of electrical action. In the application for the McNear and Bowles patent reference was made to the appellant's patent as follows:

"Said patentees [Cottrell and Speed] relied upon the electromotive force only to break down the oil partitions between the water globules, and took especial pains to prevent short-circuiting between the electrodes, and, indeed, their inventions consisted wholly in the prevention of short-circuiting. We have discovered that far better results are obtained by relying, not upon

electromotive force, but upon heat as an agent to produce coalescence between the water globules, this heat being produced by the passage of the very large electric current which is produced by short-circuiting, the amount of heat being such as to convert water globules in the path of the current into steam, and by said conversion breaking the electric current in said path."

This fanciful explanation of the effect of the current in the appellee's process may be pardoned in view of the fact that neither the patentees of that patent nor any expert witness was able to say just what does occur in the mass of the fluid when under treatment in either process. The theory that in the appellee's process the water globules are by the electric current converted into steam is not established by evidence, and is discredited by the appellee's expert witnesses. The defense of noninfringement, therefore, rests upon the appellee's contention that in the appellant's process there is no passage of electric current from one electrode to another, and that the dehydration of oil accomplished therein is the result of the maintenance of an electrostatic condition in the fluid between the two electrodes, whereas in the appellee's process the dehydration is accomplished by the passage of currents of electricity from one electrode to another. In other words, according to the appellee, it is essential to the appellant's process that short-circuiting be avoided, while it is essential to the appellee's process that short-circuiting be produced. We are led, therefore, to the inquiry what is short-circuiting as referred to in the appellant's claims, and what is the proper construction of the appellant's claim where it provides for a source of electricity of sufficient voltage to prevent the coalescing globules from forming complete chains short-circuiting the electrodes.

[1-4] It is clear that the appellant's process contemplates the formation of chains of globules of water between the electrodes, and their disruption by electric current as soon as formed, and that the limitation of the claim is only that the chains shall not be of such number and dimensions as to afford transit through the fluid of sufficient of the electric current to short-circuit the same, and thus render the current ineffective in the process. The inventors believed that such chains were formed, and that the success of their process depended on the creation and destruction of them. Their specifications show that they had in mind the fact that between the electrodes water globules in the oil would immediately commence to arrange themselves in chains, extending out from each electrode to the other, and that in order to prevent the formation of short circuits within the liquid, due to chains of water globules forming from one electrode to the other, it was necessary to prevent the potential difference between the electrodes from falling too low to produce the disruptive forces, either electrostatic or thermal, which the high potential exerts on the chains of water. They said:

"If the potential falls too low, then * * * permanent electrolytically conducting chains are established between the electrodes, thereby reducing the potential difference of the latter still more, and wasting a part of the supplied energy in useless heat of electrolytic conduction."

The appellee's expert witness Johnson admits that in the appellant's process momentary or instantaneous chains are formed bridg-

ing the electrode gap, but he was of the opinion that these chains were broken mechanically by the movement of the oil and the movement of the electrodes, and not by an electrolytically conducted current. This opinion was expressed upon his understanding that the oil was in more rapid movement in the appellant's process than in the appellee's, and that the electrodes in the appellant's patent were not stationary as in the appellee's process, but revolved. He admitted, however, that if the current moved at the same rate of speed in both, and both had stationary electrodes, their operation would be the same. The expert witness and the court below seem to have fallen into the error of assuming that the inner electrode of the appellant's patent revolved. As described in the patents in suit, the inner electrode is stationary. It was in a subsequent patent issued to Cottrell and Wright, and assigned to the appellant, not involved in this suit, that a revolving electrode was disclosed.

But the question here is not a question of difference of apparatus or difference of speed with which the oil is conducted through the same. It is simply the question whether or not the appellee's process can be read upon the appellant's claims. There is no mention in any of those claims of any mechanical means for preventing short-circuiting. There can be no doubt, we think, that the appellee prevents short-circuiting in the same manner and for the same purpose, if not to the same degree, as does the appellant. The degree is unimportant. It is obvious that neither the appellant's nor the appellee's process will work if the current is entirely short-circuited. It is necessary in both to maintain a high voltage, and to permit the passage from one electrode to the other of small portions only of the current. That the appellee maintains such high voltage is indicated by the oscillographs taken by its own expert. These show that during the process there is no lowering of the potential to such a degree as to make the process inoperative, but that there is at all times sufficient electric charge in the electrodes to maintain the necessary electric strain. Professor Cory, expert witness for the appellee, testified concerning the appellee's treaters:

"I am not at all desirous of saying that I know exactly what occurs in any of these treaters. I do know this, that in the operation of the treaters * * * an emulsion is delivered into the treater, and that a difference of potential is applied to the electrodes, that that difference of potential produces short circuits between these electrodes, that these short circuits could only occur because of the formation of chains of water globules between the electrodes, and that as a result the water is definitely separated from the oil and is drawn off."

Evidently the witness meant that in the process momentary short circuits were produced, but not a total short circuit; for there is no suggestion in his testimony or in any of the evidence that in the appellee's treaters the potential of the charge ever falls so low as to diminish the electric strain between the electrodes to a point where coalescence of the water globules ceases.

The term "short-circuiting" in the appellant's claims, if susceptible of two meanings, should be given that which the specifications show it was intended to have, if that meaning is not repugnant to the plain and clear terms used. Cottrell and Speed were the first to discover

the process of dehydrating oil by electricity. Their invention went into large and extensive use. For a time it was used by the appellee under a license. Prof. Cory states that so far as he knows it is a pioneer invention. It should receive a fairly liberal construction—a construction that will uphold rather than destroy. The construction given the term "short-circuiting" by the court below is, we think, erroneous. What the inventors meant by the term was a total short-circuiting, and not the succession of minute short-circuits snapping from one electrode to another, whereby dehydration is accomplished in both the appellant's and the appellee's process. The claims of the appellant's patent must be read in the light of the invention as disclosed in the specifications. It appears therefrom that the inventors recognized the essential value of the formation of chains between the electrodes and the instantaneous disruption of the chains by electric current, and at the same time the necessity of maintaining the potentiality of the main current, and that it was to express that necessity that they inserted in the claim the caution against such short-circuiting of the current as to interfere with the process. They realized that the momentary passage of short currents between the electrodes would not "short-circuit" their current in the sense in which they used that term in their claims.

[5] But it was not essential that they should either understand or set forth the principle on which their process operated. In Andrews v. Cross (C. C.) 19 Blatchf. 294, 305, 8 Fed. 269, Judge Blatchford said:

"It may be that the inventor did not know what the scientific principle was, or that, knowing it, he omitted, from accident or design, to set it forth. That does not vitiate the patent. He sets forth the process or mode of operation which ends in the result, and the means for working out the process or mode of operation. The principle referred to is only the why and the wherefore. That is not required to be set forth."

In Eames v. Andrews, 122 U. S. 40, 55, 7 Sup. Ct. 1073, 30 L. Ed. 1064, the foregoing language of Judge Blatchford was quoted and approved. Professor Cory admitted his want of definite knowledge as to what occurs in the process. He testified:

"Q. As a matter of fact, aren't these water chains formed in the Cottrell process and immediately disrupted? A. I don't know. Q. In the McNear-Bowles process, is it not a fact that the chains are formed, and then immediately thereafter disrupted? A. I don't know. Q. Is it not a fact that that disruption takes place by the passage of the current through the chains? A. In all probability, but if you ask me to state definitely, I don't know."

He was of the opinion, however, that chains are formed in the appellant's process. He says:

"With the continuation of the electric forces between these particles, due entirely to electrostatic attraction and repulsion, sooner or later there will be many of these chains, and if that voltage is continued sufficiently a complete chain will be formed. Now, when that happens things have changed entirely from that existing at the beginning. A current flow begins to manifest itself."

The witness thus fairly describes the appellant's process, the theory of which is that, if the voltage is sufficiently high, chains are

formed and a current flow instantaneously occurs, which demolishes the chains, whereby the flow is arrested. That a variation in the current does occur in practice is shown in the appellant's specifications, which state that when the proper electromotive force is applied the ammeter will show "irregular variation" in the current, or "occasional momentary variation."

[6, 7] The appellee contends that the extensive use and great utility of the appellant's process is owing to the use of the rotating type of treater disclosed in the Cottrell and Wright patent assigned to the appellant, and not involved in the present suit, and that the inventions disclosed in the patents in suit are not operative. This contention is not sustained by the record. In the first place, the fate of the appellant's process patent is not linked with that of its apparatus patent. Risdon Locomotive Works v. Medart, 158 U. S. 68, 15 Sup. Ct. 745, 39 L. Ed. 899; Tilghman v. Proctor, 102 U. S. 707, 26 L. Ed. 279. Said the court in Buffalo Forge Co. v. City of Buffalo, 255 Fed. 83, —— C. C. A. ——: "No process patent is in theory either helped or harmed by the excellence or worthlessness of the disclosed apparatus by which it is illustrated." Again, the evidence shows that it is not true that the first apparatus was a failure. A "treater" constructed under the apparatus patent in 1909 was in use for several years. The evidence is that it required readjustment, and that it was not perfect in operation, and that some three years later the appellant resorted to the use of treaters with revolving electrodes as disclosed in the Cottrell and Wright patent, and thereby increased the efficiency of the process from 15 to 25 per cent. No defect in the process patent, therefore, can be predicated upon defects in the apparatus patent, and the fact that the first apparatus was defective is no reason for denying protection to either the patented process or the apparatus. Mergenthaler Linotype Co. v. Press Pub. Co. (C. C.) 57 Fed. 502; Von Schmidt v. Bowers, 80 Fed. 121, 25 C. C. A. 323. If, as we have found, the appellee uses the appellant's process it is immaterial that, by improvements in structure of its apparatus, the appellee has so increased the efficiency of its machine that it marks a distinct improvement upon the appellant's apparatus. In Cochrane v. Deener, 94 U. S. 787, 24 L. Ed. 139, Mr. Justice Bradley, speaking of improvements made by the defendants, said:

"But it cannot be seriously denied that Cochrane's invention lies at the bottom of these improvements, is involved in them, and was itself capable of beneficial use, and was put to such use. It had all the elements and circumstances necessary for sustaining the patent, and cannot be appropriated by the defendants, even though supplemented by, and enveloped in, very important and material improvements of their own."

It follows that the appellee has infringed, in the form of treater first used by it, claims 1, 2, 3, 4, and 7 of process patent No. 987,-115, and that in its second form of treater, the one now used, it infringes claims 1, 2, 3, and 7, and that in both forms of treaters the appellee has infringed claim 1 of the apparatus patent No. 987,116.

The decree is reversed, and the cause is remanded to the court below, with instructions to enter an injunction in accordance with the foregoing views, and for accounting.