**ALEXANDER ANDERSON, Inc., v. EASTMAN.**

**SAME v. EASTMAN OIL WELL SURVEY CO. OF CALIFORNIA et al.**
**Nos. 4–M, 735–M.**

District Court, S. D. California, Central Division.

Sept. 26, 1936.

Hamer H. Jamieson, of Los Angeles, Cal., for plaintiff.

Joseph F. Westall, of Los Angeles, Cal., Houser, Houser & Houser by John T. Hous-

er, all of Long Beach, Cal., and Henry P. Goodwin, of Los Angeles, Cal., for defendants.

McCORMICK, District Judge.

These are consolidated suits in equity for infringement of patents, No. 1,770,224, granted July 8, 1930, to Alexander Anderson, and No. 1,830,345, granted November 3, 1931, to the same patentee.

The main grounds of defense are: (1) Want of invention; (2) anticipation or lack of novelty; (3) no infringement.

Both patents are for "bore hole directional apparatus and methods of orientation," and they describe and claim methods of orienting an instrument or a tool in a bore hole, and they also describe and claim apparatus used for carrying out the methods. The evidence shows that the practices of the complainant within the jurisdiction of this court that embody teachings and claims of the patents have been extensive and very profitable commercially. The sole use of the methods and apparatus shown by the evidence in this action is the surveying and orientation of a deflecting tool known in the oil industry as a "whipstock." This metallic instrument, fabricated so that the upper part of it curves in one definite direction, is connected to the end of a string of pipe and tools in drilling operations. As the whipstock is lowered into the bore hole it has a light method of attachment which is easily detached from the rest of the string, and when a desired position is reached in the hole the whipstock is disconnected and fixed in the bore hole, and in the subsequent drilling the bit, upon hitting the whipstock, causes the bore hole to be deflected in any desired direction.

A bore hole or any oil well drilled into the earth's crust will in most instances deviate from the vertical or from the direction in which it is started; and in order to determine the course of the hole it is necessary to know at a sufficiently large number of points or stages the direction and amount of deviation of the bore hole and the length of the successive stages of measurement.

The evidence in this consolidated suit shows that until Anderson, the patentee, conceived, as early as 1923, and later put into commercial practice in the oil fields of California the methods and apparatus covered by the aforesaid two patents there was no known adequate or accurate method whereby the orientation of instruments at the end of a string of pipe in oil wells could be determined, measured, and recorded with precision.

When Anderson first suggested, about 1924, that he had solved the problem by a method that utilized the drill pipe and other ordinary instrumentalities around an oil well derrick in combination with other inexpensive apparatus, he was told that his suggestions were ridiculous because "drill pipe twists just like a rag," and it was impossible to measure its rotation accurately at all stages of operation.

There can be no doubt that it is highly important, in oil production, to be able to orient from the ground and at various stages of the pipe movement exactly which way the whipstock or other tool or instrument is facing when it is set at any point underground, and the utilization of instrumentalities that are within claims of the patents in suit is very beneficial in the petroleum industry and has produced results, in closely drilled areas, that are far reaching. And if the conception of the patentee as disclosed and claimed by him in the patents in suit was the discovery and primary reduction to commercial use of the method and apparatus by which accurate measurements of angles of rotation incident to successive stages of lowering of the pipe in an oil well can be determined with precision, then he is surely entitled to enjoy broadly the fruits of his invention; but, on the other hand, if Anderson's contribution to the art was but an adaptation of old, known, and used methods and/or apparatus to new conditions, his advance is merely improvement in form, and his monopoly rights are correlatively narrow. In other words, an inventor is entitled to patent protection in what he invents that substantially, beneficially, and usefully contributes to and advances art or science. Petroleum Rectifying Co. v. Reward Oil Co. (C.C.A.9) 260 F. 177.

The real question then is whether the patents are valid in the light of the prior art shown in this record, and, if so, whether the inventions should be classified as generic in patent law and entitled to liberal treatment. If either patent and any claim therein should be so classified, in my opinion, under the record made, infringement by defendants has been established.

In considering the combination method claims of the patents in suit, it is well to

have in mind at the outset the principle of interpretation applicable to process patents in fields of an art that have been trodden, because the file wrapper, as well as the record, discloses other patents and methods in bore hole survey activities that antedate Anderson's effort, demonstrating that he was an investigator in an old area of information.

"Such a patent," says the Supreme Court in Minerals Separation v. Butte, etc., Mining Co., 250 U.S. 336, 346, 39 S.Ct. 496, 499, 63 L.Ed. 1019, "in such a field of investigation, must be construed strictly, but candidly and fairly, to give to the patentees the full benefit, but not more, of the disclosure of their discovery which is to become a part of the public stock of knowledge upon the expiration of the patent period, and which was the consideration for the grant to them of a patent monopoly."

And later, the same court, in Eibel Process Co. v. Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L.Ed. 523, speaking through Chief Justice Taft, stated: "In administering the patent law, the court first looks into the art, to find what the real merit of the alleged discovery or invention is, and whether it has advanced the art substantially. If it has done so, then the court is liberal in its construction of the patent, to secure to the inventor the reward he deserves. If what he has done works only a slight step forward, and that which he says is a discovery is on the border line between mere mechanical change and real invention, then his patent, if sustained, will be given a narrow scope, and infringement will be found only in approximate copies of the new device. * * * His was not a pioneer patent, creating a new art; but a patent which is only an improvement on an old machine may be very meritorious, and entitled to liberal treatment. Indeed, when one notes the crude workings of machines of famous pioneer inventions and discoveries, and compares them with the modern machines and processes exemplifying the principle of the pioneer discovery, one hesitates in the division of credit between the original inventor and the improvers, and certainly finds no reason to withhold from the really meritorious improver, the application of the rule 'ut res magis valeat quam pereat.' "

■ There were urged at the hearing before the court, as anticipations or as affecting novelty, patents that were before the patent office when the grants were made to the patentee. These citations are entitled to but little weight at this time, because of the issuance of the patents after consideration of such references, and if no further prior uses or printed publications had been shown, this court's work would be comparatively simple, because the presumption of validity arising from the grant of the patent would be applicable in that situation, because the patents issued only after rejection of many claims and upon repeated amendments and cancellations by the applicant. See United Shirt & Collar Co. v. Beattie (C.C.) 138 F. 136; Kawneer Co. v. McHugh et al. (D.C.) 51 F.(2d) 560, 563. But there are references now before the court that were not presented to the Patent Office or considered by it, and from which defendants vigorously contend that the substance and essence of the two patents in suit were known and practiced commercially and successfully several years prior to Anderson's conceptions. These facts affect the presumption in favor of the validity of the patent from its issuance. Hoe & Co. v. Goss Printing Press Co. (C.C.A.2) 30 F.(2d) 271; Elliott & Co. v. Youngstown Car Mfg. Co. (C.C.A.3) 181 F. 345; Westinghouse E. & Mfg. Co. v. Toledo, P. C. & L. R. Co. (C.C.A.6) 172 F. 371. And while primarily the presumption of validity remains invokable to the patentee and his assignee, and our inquiry herein must proceed upon its existence, it is not impregnable, but is removed if defendants have clearly and beyond reasonable doubt proven prior patents, uses, or printed publications, undisclosed to the Patent Office, that are anticipations or that negative inventive features of the claims in controversy in the court. Reinhart's, Inc. v. Caterpillar Tractor Co. (C.C.A.9) 85 F.(2d) 628.

The claims of the two patents that are in issue in this consolidated suit are claims 1, 2, 3, 4, 5, 6, 8, 12, 13, 14, and 18 of patent No. 1,770,224, and claims 4 and 6 of patent No. 1,830,345. Some of these are method claims and some are apparatus claims. Each relates to an assembly or combination.

The later patent relates to substantially the same subject-matter as the earlier one, and the second patent having been divided out of the application for the first during prosecution before the Patent Office, it becomes unnecessary to discuss each questioned claim separately, because under the concession of respective counsel claim 3

of the first patent is the broadest method claim, and claim 14 of the same patent is the broadest apparatus claim, and if either or both of these claims be valid all of the other respective claims in suit are likewise sustained, and, further, if infringement by any defendant of either broadest claim is proven, then complainant is entitled to a decree herein.

Claim 3 of patent No. 1,770,224 reads: "3. In a method of determining the orientation of a device that is moved within and longitudinally of a bore hole to different points along the length thereof, the steps comprising initially determining the rotational relation of the device with respect to a chosen plane of direction, moving the device along within and longitudinally of the bore in stages, and measuring the extent and direction of rotation of the device that occurs during each such stage of its movement."

Claim 14 of the same patent is as follows: "14. A sighting device for use in determining the orientation of a line of pipe in a bore hole which comprises in combination, a sighting member, means for supporting said member on said pipe for rotation about the axis thereof and for sighting upon a fixed object distant from the pipe, means for holding said member against rotation, and means for measuring rotation of said sighting member with respect to the axis of the pipe."

There have been cited, urged, and explained as anticipations or limitations of the scope of the alleged invention the following earlier patents that were not considered by the Patent Office during the proceedings therein that culminated in the grant of the first patent: Gardner No. 563,226, June 30, 1896, for improvement in shaft liners; Sousae and McLain No. 1,083,341, January 6, 1914, for improvements in guides for well casings; Anderson and Dean No. 881,280, March 10, 1908, for improvement in post-hole diggers; Koerner (British) No. 7,797, March 31, 1906, for improvements in or relating to measuring devices for deep boring apparatus. There were also introduced in evidence publications showing surveyors' transits and miscellaneous instruments. All of these references have been examined and considered.

None of them considered alone bears upon or in any substantial manner relates to the concrete problem that confronted Anderson of finding a practical method of surveying deep oil wells and orienting instrumentalities found therein at any stage of operation and doing it accurately; much less do any of these references suggest or present accurate, economical and successful solution of that problem by sighting from an oil well derrick to a distant object.

The most that can be said of these citations is that they deal with methods or devices for lining shafts or pipes. They do not deal with the important feature of the Anderson patents of economically and with simple apparatus measuring, ascertaining, and recording from and within the derrick the amount of rotation of the shaft or pipe as it descends or ascends in a bore hole. This is a highly valuable contribution to the bore hole orientation art of the oil industry, and I consider it to be the inventive element of the Anderson patents here in controversy.

The references that in my opinion come nearest to the Anderson novel concept as disclosed in the two questioned patents are:

(1) The "Elliott Use" employed in 1919 and 1920 in core drilling operations in the Los Angeles oil fields.

(2) The so-called "Kiruna Method" described in a publication in the Swedish language as a process of measuring deviations in deep bore holes that according to the publication had been conducted in mining districts of Sweden. This Swedish publication was placed on the shelves of the Engineering Societies Library at New York City on January 16, 1923.

(3) A method known as "The Stratemeter of Kuppers," described in a publication in the German language that was placed in the library of the Engineering Societies at New York City on August 1, 1912.

There has been much dispute between the litigants as to the correct translation of this last-mentioned printed publication. I have no knowledge of the German language and must rely entirely upon the witness who to my mind is best qualified and least interested in this suit to translate these writings accurately. The plaintiff produced Dr. Beno Gutenberg, a professor of geophysics and mineralogy at the California Institute of Technology, who is also a native and scholar of Germany. His translations are accepted by this court.

It is to be noted with respect to these two foreign language references that any application to use of the methods described in them is based entirely upon the truthfulness of the representations made in unverified writings themselves, and must therefore be regarded as a very unsatisfactory kind of evidence. This is particularly so where there are substantial differences in the translations of the complainant and the defendants. It was shown that the library from which these foreign language publications were obtained· is registered with the state of New York as a public library, but it is not supported by public funds, and although the public has access to its shelves, some of the books and publications thereon are not for general public use. It is doubtful, under such conditions, whether these foreign publications should be regarded as prior publications under section 31, title 35 U.S.C.A., so as to defeat or limit an otherwise valid domestic patent issued and granted by the United States. But be that as it may, both foreign publications have been considered, and their applicability is insufficient to defeat the claims of the patents in controversy.

Before briefly discussing reasons that justify the conclusion just reached, consideration should be given to the "Elliott Use." The evidence concerning this method is clear and positive. It is shown, by reports that were made at about the times in 1919 and 1920, that the method was commercially practiced in the oil fields of California. There were also oral descriptions by men who participated in the operations, and the work was further illustrated by photographs taken during the operations long prior to Anderson's efforts or patents.

Elliott's method of ascertaining direction in the oil well is accomplished by projecting a line down the length·of the drill pipe to the core barrel by the use of a transit and two specially made clamps. The transit is positioned about 200 feet outside of the derrick. It is trained on the drill pipe and is locked in position so that its telescope cannot rotate horizontally but can move only vertically. This changes this sighting member from a transit into actually a fixed telescope capable of defining a vertical plane. As the operator looks through the sighting instrument at the pipe the vertical hair in the sighting member will constitute a vertical strip the entire length of the pipe as it is withdrawn from the hole. Specially designed clamps are used by Elliott, and each clamp has a distinct vertical marker line. These clamps are attached to each section of the pipe before it is elevated from the slips, in such a position that it is in the plane of the vertical hair line of the locked transit that is observed by the transit man outside of the derrick. After the pipe has been elevated to its uppermost position, the pipe is rotated by hand until the vertical marker line on the clamp is again in the vertical plane of the vertical hair line of the locked transit, and then the pipe is held in that position until the slips are set. Another clamp is then similarly attached to the next section of pipe. By repeating this process or operation it is seen that the stripe is projected down the entire length of the pipe to the bottom of the core.

The "Elliott Use," while a progressive step over earlier methods, falls short of meeting the problem solved by Anderson in his patents. The degree of accuracy attained is not at all comparable. Any measurement of rotation by Elliott, if his estimating or "keeping track" of the extent of the movement of the pipe can be properly called "measuring," was not careful, accurate, or precise, and it produced hazardous results. The distance and depth of the bore holes surveyed by Elliott and those with which Anderson is especially concerned are different. There was no satisfactory means provided or effort made by Elliott to measure any angle of rotation that the pipe suffered in coming out of the hole, which, as adverted to, is a chief attribute of the Anderson method. Anderson provides and utilizes an apparatus in combination for measurement of angles of rotation of a pipe, but he also originates a method of orientation in bore holes which employs the step of precisely measuring angles of rotation of a pipe at any stage of its descent, ascent or movement in a bore hole. No other reference in this record shows these accomplishments. Like other striping methods in the bore hole survey art, such as the White or Kind methods mentioned in the evidence, Elliott did not employ any sighting device or instrument attached to the drill pipe. The argument of defendants, that the ocular and manual action of the driller who is on the·derrick floor turning the pipe so that the marker on the encircling upper clamp is in line with the vertical line of the distant transit is the equivalent of the sighting means or instrument described in the patents, is nov-

el, but inadequate to cover this feature of Anderson. And while it was shown that the "Elliott Use" was progressive and meritorious, it lacked the range and accuracy that was later first attained by Anderson's method. It is particularly in deep well operations that Anderson's disclosures and methods are original, unique and exact, and constitute invention over the "Elliott Use." As our Circuit Court of Appeals has said in Tashjian v. Forderer Cornice Works, 14 F.(2d) 414, 415, in considering the pertinency of prior patents and uses in an infringement suit, in such matters "it is the question whether or not the structures described in the prior art are such that they could be used in the precise manner in which the appellant's structure is used."

Measured by this test, the "Elliott Use" falls short of anticipating either of the patents in suit so as to defeat all the claims thereof that complainant relies on in this suit. It required something more than mere mechanical skill to convert "Elliott's Use" into the accomplishments of Anderson's patents, as otherwise the Elliott organization and the major oil company that utilized Elliott's method, which consisted of trained and experienced engineers and skilled mechanics, would have used, long before Anderson's work, his methods. There is no evidence that any did so.

Only recently, in Buono v. Yankee Maid Dress Corporation (C.C.A.2) 77 F.(2d) 274, the court proclaimed an old doctrine that where the method or device satisfies an old and recognized want, invention is to be inferred rather than the exercise of mechanical skill.

We conclude consideration of the "Elliott Use" with the observation that if this reference could be said to defeat the broad aspect of the Anderson concept so as to limit method claim No. 3 of the first patent to "calibrated measurement," nevertheless defendants cannot take refuge thereunder because they have used "calibrated measurement" and therefore run against the terms of claim No. 5 of the same patent, which is under no interpretation covered by the "Elliott Use" or any other use or method antedating Anderson, but which clearly includes calibrated measurements and reads upon defendants' method and apparatus as shown by the record.

Claim 5 of patent No. 1,770,224 is as follows: "5. In a method of determining the orientation at any desired point within a bore hole of a device that is moved within and longitudinally of the bore hole by means of a sectional elongated member, the steps comprising initially determining the rotational relation of one section of the member with respect to a chosen plane of direction, successively altering the length of the member one section thereof at a time and moving the device along the bore by moving the elongated member therein while permitting it to partake of such rotation as is incident to its movement in the bore, and successively measuring the extent and direction of rotation of each section of the member, by which the length of the member is altered, that occurs during movement of the member longitudinally of the bore, whereby the algebraic sum of the rotations of the sections defines the change in the orientation of the device."

It should be here observed that no merit is found in the contention that the patentee limited his method claims so as to exclude "calibrated measurements" of extent and direction of rotation of the pipe or device in the bore hole. It was the measuring of angles of rotation of the pipe's ascent or descent in the bore that interested Anderson in the art and industry in which he was working, and he employs verbiage, language, and description in his patents and in the proceedings leading up to their issuance that clearly connote that his methods included those of making and recording "calibrated measurements" of rotation.

The following description, in patent No. 1,770,224, as well as other wording found in the Patent Office proceedings disclosed in the file wrapper in evidence, and descriptive matter in patent No. 1,830,345, shows the inclusive and broad meaning that should be read into the use of the term "measuring" employed in the claims in issue:

"I shall now describe the clamping devices shown in detail in Figures 7, 8 and 9. * * * The lower surface of the upper clamp member shown in Figure 7 is made flat and at right angles to the cylindrical surfaces of the inner faces of the segments. The outer edges are made cylindrical and concentric with the inner surface of the segments.

"The outer surfaces of the upper clamp have index points from 1 to 12 engraved upon them. While I have chosen these index points as numbered, it is obvious

that others might be used, and I am not limited to this particular number or arrangement of index points. * * *

"I shall now describe the lower clamp shown particularly in Figures 8 and 9. This clamp is made up of two segments J, J¹ which are hinged together as shown at J². The inner surfaces of the segments J, J¹ are made accurately to the same radius as the pipe which they are intended to fit, except for two recesses, one opposite the hinge J² and the other opposite the opening point of the clamp. J³ is a pin mounted for rotation in the clamp segment J¹. It carries a bolt J⁴. The pin is preferably retained in a sleeve J⁵ which surrounds it. The ends of the segments J, J¹ are slotted at J⁶, J⁷ respectively. A circular recess J⁸ secures the nut J⁹ in position even if it is not fully tightened up.

"The top side of the clamp is made flat and at right angles to the cylindrical inner surface of the clamp segments. The outer surface of the clamp segments is made cylindrical and concentric with the inner cylindrical surface. The part J¹ of the clamp has a scale of degrees Y engraved on its upper edge, and the part J also has a scale of degrees X engraved on its upper edge, each starting at zero.

"It will be obvious that the markings of the scales X and Y could be made upon the upper clamp, and that the index markings could be made or engraved upon the lower clamp. Such alternative locations of the scale and index on the clamps, clearly, would not affect, in any way, the practice of this invention. * * *

"A modification of the above method consists in measuring the angular turn of the pipe as each stand is passed into the hole. The algebraic sum of these quantities gives the exact orientation at any point, and with this method a repeated turning of the pipe is avoided. In the modified method, the lower of the first pair of clamps is clamped firmly to the first stand of pipe at a point near the upper end of that stand of pipe, the upper of the first pair of clamps is placed around the pipe above that lower clamp, the sighting device is aligned with the chosen plane of direction by sighting it upon the chosen target, and the upper clamp is clamped to the pipe. The first stand of pipe is then lowered and the second stand is screwed on. Then before moving the pipe, the relation of one of the index points 1, 2, 3, etc., of the first pair of clamps, with re-

spect to one of the scales X or Y of the first pair of clamps is noted. For example, index point 2 may coincide with the 105° mark on scale X. Then the upper clamp of this first pair of clamps is loosened, and rotated until the sighting device is sighted on the target, and the relative position of index point 2 with respect to scale X is noted. For example, index point 2 may then coincide with the 123° mark on scale X. In the example described the pipe and the attached survey device rotated 18° to the left from its initial position. Before the pipe is moved again a second pair of clamps is similarly attached to and sighted in at the top of the second or last added stand of pipe. These operations are repeated until the pipe has been lowered to the desired depth, and the algebraic sum of the rotations so measured, that respectively occurred during the lowering of the pipe after the addition thereto of each stand gives the total rotation of the lower end of the pipe. Similarly, the algebraic summation of the appropriate rotations measured will give the total rotation at any depth with respect to which that information is desired, as a constant record of the rotational position of the pipe is made by the operations above described.

"Instead of taking the angular readings from graduations on the clamps, they may be obtained by sighting on and reading a graduated scale placed on the derrick floor, and preferably graduated to right and left from a central zero located on the line of sight of the target. These two latter methods save most of the time required for turning the pipe and also have the advantage of allowing the pipe to slide into the hole in a natural manner and leaving it undisturbed in the position it has already taken up. Fig. 13 of the drawings shows, diagrammatically, the use of a graduated scale-board J¹², to be positioned at a suitable height above the derrick floor. This scale, in practice, may be conveniently secured upon the derrick floor, and on the side of the derrick which faces in the direction of the distant sighting object Q shown in Fig. 1. This scale is so positioned that a substantially mid-point, to be used as the zero point, will lie in the line of the chosen direction or azimuth. When using such a scale, only the sighting clamp is required to be used on the pipe. This clamp is placed upon the upper end of a pipe section, and rotated until the line of sight of the sighting device falls exactly

on the distant target Q. The clamp is then secured to the pipe in that selected position, and the pipe section with the clamp attached is lowered until the clamp approaches the derrick floor, or about the level of the scale-board $J^{12}$. At this level, a sighting device is again inserted in the clamp, and sighting upon the scale-board, a reading is taken, which may be either to the right or left of the zero mark on the scale. Such reading then will be an accurate measure of the amount and direction of rotation of the pipe incidental to its lowering; and as the process of adding sections, in lowering the pipe into a bore hole is repeated, or removing sections in raising or removing the pipe from the bore hole, the algebraic sum of the readings from the scale-board $J^{12}$ (these readings being positive on one side of the zero mark and negative on the other side) will measure or determine the total rotational movement of the pipe."

In International Cork Co. v. New Process Cork Co. (C.C.A.) 6 F.(2d) 420, 422, the court stated: "A patentee may define his own terms, regardless of common or technical meaning, and fairness to the patentee requires the court to accept his definition of words, phrases, and terms. Rajah Auto Supply Co. v. Belvidere, etc., Co. (C. C.A.) 275 F. 761. The words of the claims are sufficiently explained in the descriptive part of the specification." See, also, Turrill v. Michigan Southern & N. I. R. Co., 1 Wall. 491, 17 L.Ed. 668; Advance Rumley Co. v. John Lauson Mfg. Co. (C.C.A. 7) 275 F. 249.

Coming now to the "Kiruna Method," its differentiation from the Anderson methods and apparatus shown by the patents in suit is notable and clear. The chief distinction, however, is that shown throughout when the prior art references in this suit are considered. The patents in controversy and the evidence as to the use of the methods therein described and claimed with devices specified in the patents precisely make, with economy of time and apparatus, observations, measurements, and records, at any stage of operations, of the amount of rotation of the pipe as it enters or leaves the bore hole. The "Kiruna Method" does not accomplish, and is not devised to attain, this result. This "Kiruna Method" is nothing but a modified form of the scriving method of orientation of pipe or rods in bore holes.

There is described in the publications of the "Kiruna Method" an improvement over the earlier and unreliable methods of physically or manually striping or actually marking the tubing or pipe as it was lowered in the bore hole in orienting activities therein. This improvement consists of using devices called in the publication "orientation couplings" with electrolytic registering apparatus. These are electrically recording acid bottles whose recordings will give the inclination and direction thereof with reference to the vertical plane. It is unnecessary to describe further the mechanism used, as it is substantially different from that employed by Anderson, and moreover is expensive in comparison to the methods and instrumentalities specified and claimed in the patents under attack. There is similarity between the sighting device of the "Kiruna Method" and that shown to be the instrument for sighting in defendants' infringing method. Both use the transit or dioptric gauge, as the member is called in Kiruna, in attempting to determine the rotational relation of a device attached to the pipe in the bore hole with respect to a chosen plane of direction. However, it is only by adding and using the method first clearly described and taught by the first Anderson patent that defendants accurately and with precision are able at all stages of operations to orient, measure, and record the angles and amount of rotation of the pipe and device in the bore hole in upward or downward movements.

The final, and judged from the amount of evidence and argument the principal, prior method and apparatus relied upon by defendants to defeat or limit the claims of the Anderson patents in suit is that described in printed publications in the German language already mentioned and known as the "Kuppers Method."

This publication appears in a section under a printed article that has the general title "Measurement of the Rotation of the Apparatus Strongly Connected so that it Cannot Be Moved with the Drill Pipe." The two sections of this article that describe the Kuppers method, as translated by the witness Dr. Gutenberg, read: "The stratemeter of Kuppers. A new construction which starts from the same points of view is due to Markscheider Kuppers in Hamm who made a few years ago experiments in various wells. The effect of the

apparatus is due to fixing and transferring a line known in its strike above ground to the core as long as this is in solid connection with the bedrock. Figures 615 to 617 give a view of the apparatus which consists of an iron clamp, like handcuffs, and rule, connected with it, so that it can be rotated around it, consisting of the thin band of iron. This clamp may be opened up, and is kept together by a screw with nut. The diameter is selected for matter of convenience so large that the clamp itself may be put around the collar of the drilling pipes. To adjust the clamp to each desired diameter, three set screws are used in the way indicated in Figure 615. The rotation of the rule occurs in the horizontal plane of the clamp by means of a semi-circular piece of iron which is movable in a pivot. To fix the rule a screw is used, which in being tightened clamps the semi-circle and therefore simultaneously the rule. See Figure 615. To measure with a stratemeter two apparatuses are needed: The measurements are done above ground. After having drilled about 50 centimeters the measurement is started. First the drill pipes are lifted so far that the spring ring in the crown just touches the core, so that just clamps the core so that the drill pipe may swing free. This has the purpose to remove the shearing stress, which is in the drill pipe since the drilling, as otherwise there would be a cause of errors in measurement. To transfer the line which has been fixed inside the derrick, in the derrick before, from the uppermost stage two plumb lines are hung down in such a way that the plane through these two plumb lines is parallel to the known line. It is convenient to have the plumb lines immersed into vessels filled with oil to quiet them down more quickly. After having finished this preparation the first clamp is fastened just on top of the water trough or rinsing trough to the drill pipe. Its rule is adjusted exactly parallel to the plane of the plumb lines and clamped. Then the core is broken off by lifting the drill pipes. The first part of the drill pipes is lifted out and before it is unscrewed the second clamp is fastened to the collar of the drill pipes, still inside the well, just on top of the rinsing trough, and by using the two plumb lines which are now hung over the front side of the first clamp which is now above in the derrick, this second clamp is fixed, is adjusted exactly parallel to the first. In fixing the clamps, care must be taken that always the front side of the rule is turned toward the observer, as in the opposite case, at once an error of 180 degrees originates. After the drill pipes and the first clamp have been unscrewed, the lifting out is continued and now the first clamp is fixed below where the second is above in the derrick. This is continued until all drill pipes have come above ground. Before taking the core out of the core drill the line given by the clamp is transferred to the underside of the core and this line is now exactly parallel to the line known before. The true depths of the layers of the core then may be determined from the layering present in the core, and the known line—the layers existing in the core. There are serious disadvantages in the method of Kuppers just as in the one of Kind and Lubisch, which make it doubtful if it is useful. First, it is questionable and also not to be proved whether in beginning the measurement the core truly was in connection really with the bedrock and not, as happens frequently, had been broken off already. But first of all it is impossible to lift the core in the original position which it had in the well as the drill pipes, as a consequence of the elastic shear, due to the rotation, and as a consequence of the friction of the side walls of the well, in lifting up may produce movements in its lower parts which not at all can be controlled by the observer above ground. The error, which is due to the transfers of the handcuff-like parts should be less important, and very probably a certain compensation of the errors between the several observers occurs."

Another translation of this method that was published reads: "The stratemeter of Markscheider Kuppers in Hamm. The apparatus consists of an iron clamp and a rule connected with it so that it may be rotated. The clamp may be opened up, is kept together by a screw with nut, and has three set screws for fine adjustment to each desired diameter by means of a semi-circular piece of iron which can be moved in the part. The rule may be rotated in a horizontal plane of the clamp. The measurements for which the two apparatuses are needed is done above ground. Before beginning the measurement the drilling pipes are lifted so far that the spring ring in the crown just catches. Then the drill pipes may swing freely. To transfer the line fixed before

in the derrick to the core two plumb lines are hung down from the uppermost stage in such a way that the plane fixed by these two plumb lines is parallel to the lines just mentioned. After the plumb lines have been quieted down, for which purpose they are immersed in vessels filled with oil, the first clamp is fastened to the drill pipes on top of the rinsing trough and the rule to it adjusted parallel to the plane of the plumb lines. Then the core is broken off. The drill pipes are lifted out, and before they are unscrewed, the second clamp fastened to the collar of the drill pipe in the well. The core, which has been cored just on top of the rinsing trough, and by using the plumb lines, this second clamp is adjusted exactly parallel to the first clamp, which is now above the derrick. The layer now is unscrewed, just as well as the drill pipes. More drill pipes are lifted out and the first clamp fastened below where now the second clamp is above in the derrick. This procedure is continued until all drill pipes are above ground. Before the core is taken out the line given by the clamp is transferred to the underside of the core. It is exactly parallel to the line known before, and by using that and the layering recognizable at the core, the dip of the layers is found. It is not known if this procedure has turned out well in practice."

Preliminarily to pointing out some differences in principle and function between the "Kuppers" method and apparatus and those of the patents now before the court, it is to be observed that there is no evidence whatever in the record that the "Kuppers Method" has ever been generally used or successfully operated, and the publication of the method and apparatus recites that "there are serious disadvantages in the method of Kuppers just as in the one of Kind and Lubisch which make it doubtful if it is useful," and, further, that "it is not known if this procedure has turned out well in practice." Under such circumstances, entirely aside from the structural and elemental differences from the Anderson patents, it would be an unwarranted stretch of construction to invalidate a patent right of a method and apparatus that has attained undoubted commercial success and general use in the art of oil well surveying by extending to a mere printed description of a method or apparatus the dignity of an anticipation, or indeed to even classify such a reference as in any manner limiting an otherwise valid broad claim in a patent that has been duly granted.

There was exhibited by defendants a model, Exhibit GG, that was made under the direction of defendants and represented by them to be a construction that embodies the "Kuppers Method" and apparatus as described in the German publications in evidence. The exhibit in my opinion is not a true model and does not correctly represent the "Kuppers Method" or assembly described and illustrated in the printed publications already mentioned.

There is no scale member or index element at the place where it appears on the exhibit, described or illustrated in the publications. There is merely a straight edge or rule mentioned and described, and it is the insertion of the scale or calibrated measuring element that lends color and support to defendants' argument that the "Kuppers" publication anticipates Anderson's measuring features whereby he accomplishes the important inventive element of his patent that has been hereinbefore mentioned whereby determination and measurement of rotation is secured.

▆ Whenever printed publications, and particularly those in foreign languages, are relied upon as anticipations or to negative novelty in a method claim of a domestic patent, the publications must, within their four corners, clearly and fully describe the method claimed in the patent and under consideration. Seymour v. Osborne, 11 Wall. 516, 20 L.Ed. 33; Permutit Co. v. Harvey Laundry Co. (C.C.A.2) 279 F. 713, 718; Permutit Co. v. Wadham (C.C.A.6) 13 F.(2d) 454, 456; Loew Filter Co. v. German-American Filter Co. (C.C.A.6) 164 F. 855; Naylor v. Alsop Process Co. (C.C. A.8) 168 F. 911, 917; Fulton Co. v. Bishop & Babcock Co. (D.C.) 17 F.(2d) 999.

The defendants' expedient act of adding something to "Kuppers" which is not found in the printed publications is tantamount to an admission by them that "Kuppers" does not anticipate Anderson's patent claims. This modified "Kuppers" is not found in the prior art. It is a subsequently conceived creature of defendants and their experts, devised to meet claims of the patents in suit which clearly read upon defendants' method. This neither negatives invention nor avoids infringement.

The inoperativeness and impracticability of the "Kuppers Method" in the oil producing industry is obvious when the long plumb bobs required are considered. Before the method is workable in any degree

of accurracy these lengthy suspended instrumentalities must be made quiescent, and time and labor not required in Anderson's process would necessarily be occasioned, if in fact they could ever be rendered satisfactorily operable in the mechanized derricks of windy oil fields of the United States.

■ It has been settled for a long time that a patent for an invention which successfully accomplishes a useful result is not void, for anticipation or prior use, because of a prior device, however similar in combination or close in resemblance to that of the patent, where such device was not operative and failed to produce the result sought, and which is produced by the device of the patent. I Hopkins on Patents, rule 17, p. 351, and cases cited; In re Coykendall, 58 App.D.C. 280, 29 F.(2d) 868.

Enough has been stated to justify the conclusion that none of the three references hereinbefore mentioned are anticipations of the patents in suit or can be considered as removing any novelty from the Anderson concept as described in the patents.

■ It appears that defendants chiefly contend that by combining these earlier references, for instance, by taking the dioptric gauge of "Kiruna" or the transit of "Elliott" and positioning it in the derrick in lieu of the plumb bobs of "Kuppers," for the establishment of a datum plane, all of the inventive features of measuring angles of rotation of a drill pipe in order to orient an object integrally attached to it, claimed by Anderson, are present, and his patent is therefore and thereby defeated. I think this contention is untenable in law.

Our Circuit Court of Appeals, in Stebler v. Riverside Heights Association, 205 F. 735, 738, quoted with approval its earlier decision in Los Alamitos Co. v. Carroll, 173 F. 280, wherein it stated: "It is not sufficient to constitute an anticipation that the devices relied upon might, by a process of modification, reorganization, or combination with each other, be made to accomplish the function performed by the device of the patent." See, also, Diamond Patent Co. v. S. E. Carr Co. (C.C.A.9) 217 F. 400, 405; and the Circuit Court of Appeals for the Second Circuit, in Bragg-Kliesrath Corporation v. Farrell, 36 F.(2d) 845, at page 849, used this pertinent language: "In our judgment, the Dickson patent was not anticipated in the prior art. It

is essentially a combination patent, and while each of the elements included in it were to be found in the prior art, the combination in the manner specified for the indicated purpose was new, and thus constituted a patentable invention. Leeds & Catlin Co. v. Victor Talking Machine Co., 213 U.S. 325, 29 S.Ct. 503, 53 L.Ed. 816; In re Coykendall, 58 App.D.C. 280, 29 F.(2d) 868; Craft-Stone, Inc. v. Zenitherm Co., Inc., 22 F.(2d) 401 (C.C.A.3)." See, also, Chicago Lock Co. v. Tratsch, et al. (C.C. A.7) 72 F.(2d) 482.

In concluding this branch of this consolidated suit by holding the patents in suit and claims 3, 5, and 14 of patent No. 1,-770,224 generally valid, it is not out of place in declaring defendants' contentions of invalidity to be untenable to paraphrase the language of the Court of Appeals of the District of Columbia in the recent patent case of Wach v. Coe, 64 App.D.C. 235, 77 F.(2d) 113, by stating that it is comparatively easy, now that the Anderson methods and apparatus are in evidence, to take this and that from the references and achieve a nunc pro tunc solution of the problem confronting Anderson when he made his invention. This cannot be done to defeat an invention that has marked a valuable forward step in an industry such as the Anderson patent has done.

Earlier in this memorandum attention has been directed to this court's view that if claims in issue of the patents in suit should be classified as basic, infringement by some defendants readily appears from the record.

The complainant experienced some difficulty in identifying which of the corporate defendants is responsible for the infringing acts that are shown by the record. These legal entities are all developments and enlargements of business activities of defendant H. John Eastman, and he has been the managing executive of these corporations throughout the periods of time involved in this suit. He is and has been the owner of at least 51 per cent. of the stock of each defendant company, and has been engaged in the oil well survey business since 1931.

The Eastman Oil Well Survey Company offers as a service the surveying of oil wells by various methods. It also offers to the oil producing industry a controlled directional drilling service by which the control of the direction of the bore hole is effected.

The Eastman Instrument Company manufactures different types of oil well survey instruments that have been employed by defendants Eastman and Eastman Oil Well Survey Company in their surveying and orienting activities that have invaded the broad claims of the patents now before the court.

The relation of the Eastman Oil Tool Company with any activity that could be regarded as infringement of complainant's patent rights is not clearly established in the record, except that it is shown that defendant Eastman is the controlling agency therein and that this company is in some manner an element in the oil well surveying and tool orienting business originated and managed by defendant Eastman wherein he has infringed complainant's patent rights.

One of the methods used and practiced by defendant Eastman and his Oil Well Survey Company as early as February 26, 1933, is substantially as follows:

The survey crew of defendants consisted of two men, one a derrick man and the other a floor operator. Both were stationed upon and within the derrick. Each had a clamp which he could and did fasten to the pipe and which would at least partially encircle the pipe. The derrick man had a small telescope which had a taper pin suitable for inserting in a taper hole in the clamp. The floor operator had a transit also equipped with a taper pin which fitted the taper hole. On this transit he read the table to determine the amount of rotation.

To describe more specifically the method and apparatus that were used, the witness who observed the operation testified regarding the matter without contradiction: "The floor operator turned the whipstock in a desired direction which was known to him, and the derrick man put a clamp at the top of the first stand, and, while the operator held the whipstock and stand of drill pipe against rotation, the derrick man sighted the first clamp on a previously chosen point. The stand and whipstock were then lowered into the hole and supported by means of slips, with the elevators unlatched and hoisted to the top of the rig, and the second stand was screwed to the top of the first. The floor operator then inserted his sighting apparatus, consisting of a transit, into a taper hole of the first clamp and read the angle measured when the telescope was turned back to the original sighting point. This angle then measured the rotation of the first stand of drill pipe. In the meantime his derrick man had sighted the second stand and the clamp in the first stand was removed and the drill pipe lowered into the hole. This operation was repeated for each succeeding stand. The operator kept the algebraic sums by rotation and was in possession of knowledge as he approached the bottom of the hole as to the amount and direction necessary to rotate the whipstock and drill stem in order that it be faced in a predetermined direction. The whipstock was then sheared. And that completes the setting of the whipstock as I saw it."

The apparatus that was used in the method just described, in addition to the derrick, pipe, and ordinary equipment of an oil well, consisted of an upper clamp having a socket member for the reception of a sighting device, Exhibit 5; a wrench for tightening clamp by derrick man, Exhibit 6; the derrick man's sight bar, being a steel tube having mounted on it two vertical members, the front member containing a hair line, the rear member containing a peep hole slot, and mounted on the sight bar also are two level bubbles to determine when the hair line is in vertical position; this assembly, Exhibit 7, is adjustable so that it and the clamp to which it is connected can be rotated until the member is sighted upon a chosen object; an operator's sight bar having two level bubbles for determining vertical position and having a hair line in front and a peep hole slot at the rear, Exhibit 8 (the operator's sight bar in defendants' operations also assumes the form of a transit); a lower or bottom clamp, Exhibit 9, that has a scale upon it which is used in conjunction with the upper clamp when it is desired to measure an angle of rotation.

In the interrogatories propounded to defendant H. John Eastman, in case No. Equity 4–M, which are also to be considered as they relate also to the corporate defendants in case No. Equity 735–M, Mr. Eastman describes his methods or processes, with photographs illustrating them, in the following manner:

"There is disclosed in 'Exhibit 3' and 'Exhibit 4' attached hereto, a bracket which is held against the pipe by a man in the derrick. The bracket with the telescope thereon is sighted upon a distant object by moving the bracket about the pipe. When

the cross hairs in the telescope are on the distant object, a plunger is released in a tube on the bracket which makes a punch mark on the pipe. The bracket is then withdrawn from the pipe and the pipe is lowered. When the punch mark reaches the derrick floor, a second bracket with a transit mounted thereon is placed against the pipe and a sighting tube on the bracket is sighted upon the punch mark previously made by the derrick bracket. The transit is then adjusted upon the same distant object and the horizontal vernier is read to determine the angular rotation of the pipe from its previous position in the derrick. The derrick bracket is shown in 'Exhibit 3' and 'Exhibit 4' and the floor bracket and transit is shown in 'Exhibit 5' and 'Exhibit 6.'

"Referring to 'Exhibit 1' and 'Exhibit 2', a bracket is attached to the pipe in the derrick by means of a 'C' clamp. The derrick telescope is removably mounted in a socket and the socket is rotatable about a vertical axis. The derrick telescope is sighted on a distant object by rotating its socket and thereafter the derrick telescope is removed from the socket. The pipe is lowered with the bracket thereon to the floor whereupon a transit is mounted in the socket of the bracket. By rotating the transit into line with the same distant object and reading the horizontal vernier, the amount of rotation of the pipe is determined. 'Exhibit 1' shows the derrick telescope in position, and 'Exhibit 2' shows the floor transit in position."

It is clear from these descriptions of the defendants' methods and apparatus, and from the entire record showing defendants' methods and devices, and comparing such matters with the two, and particularly the earliest, patents in suit, that defendants have appropriated the novel and inventive features of Anderson, both in method and in the apparatus by which the invented method is actuated and employed.

We are not to. be understood as deciding, and we do not hold, that the mere manufacture or fabrication of the material devices by which defendants effectuate their methods of surveying or orienting a whipstock in an oil well or bore hole would entitle complainant to redress in these suits, but we do think that when such devices or apparatus are assembled and used by defendants in practicing the protected methods that are contained in claims 3 and 5 of the first patent, which is the case from the activities that have been mentioned already, therein and thereby complainant is entitled to relief against. all defendants so infringing actually or in a contributory manner.

After specifying and describing operative devices and methods in patent No. 1,-770,224, the patentee states: "Although I have shown an operative device, still it will be obvious that many changes might be made in size, shape and arrangement of parts without departing materially from my invention; and I wish therefore that my showing be taken in a sense diagrammatic." And the same patent later contains the following teaching as to the scope which he expected would be given to his claims, and which if given unmistakably reads on defendants' methods and apparatus in evidence: "From the foregoing it is apparent that in the practice of my invention the orientation of the innermost end or any other part or section of a line of pipe in an elongated hole, or of a device fixed to such inner-most end or to any other part of the pipe, may be accomplished by keeping a record of the rotational movement of the pipe as it is inserted into or withdrawn from the bore hole. It will also be apparent that in keeping a record of such rotation, in accordance with my invention, one member, for example a lower clamp, is mounted upon the pipe in fixed relation thereto or for rotation therewith, and another member, such as for example, an upper clamp adjustable on the pipe or a scale board mounted on a stationary part, is adapted to be adjusted to or fixed in known relation to a chosen line of direction, to the end that a determination of the extent and direction of movement of one member with respect to the other will indicate the extent and direction of rotation of the pipe as it moves along the hole. In the determination of extent and direction of relative movement of two parts by means of a scale carried by one part and an index carried by the other, it is obviously immaterial which part carries the scale so long as the other part carries the index that cooperates with the scale. In the use of a member fixed to the pipe and a member adjustable to or fixed in known relation to a chosen direction in the practice of my invention, one of such parts carries a scale indicating angles of rotation and the other member carries an index of some kind, such as, for example, the index points 1, 2, 3, and so forth, on one of the clamps or the sighting device

for determining angles of rotation from a scale mounted on a stationary member. It is therefore apparent that such a scale may be carried by the derrick floor, or by one of two cooperating clamp members mounted on the pipe. The only important requirement is that either the member that carries the scale or the member that carries the index cooperating with the scale shall be brought to a chosen line of direction at the time an initial or rotated position of the pipe is determined."

The only difference between the methods and apparatus of defendants and those within the broad aspects of claims 3, 5, and 14 of patent No. 1,770,224 is in the design of the devices that are used for the measurement of the angle of rotation of the pipe. The assemblies accomplish the same purposes. They accomplish them by the use of substantially the same methods, and they are therefore merely variants of the same basic concept of Anderson that has been previously mentioned as being the novel element and accomplishment of his invention.

The substitution, in defendants' assembly that is contained in Exhibit 18, of the transit, an old optical measuring instrument, for the telescope and scale members of the patents in suit is the introduction of a mere mechanical equivalent and was a simple deduction to be made after Anderson had conceived and publicized his invention and the methods and apparatus for utilizing it. So also the positioning of the transit by mounting it on an axis offset from the axis of the pipe but parallel to the pipe's axis is merely disguising one of the elements of the broad apparatus claims of Anderson's patent. The incorporation of a modified appearance of the clamps is also no substantial departure from the patented apparatus claims as we construe them. It is therefore determined that the exchanges of apparatus shown by defendants' devices and assemblies are modification of form and not of substance, and having been used in practicing the patented methods are infringements to that extent.

■ If our conclusion of the validity and scope of patent No. 1,770,224 is correct, then the second patent, No. 1,830,345, is invalid as being within the broad claims of the first patent.

In concluding this memorandum, the court's decision in these consolidated causes is summarized as follows:

Patent No. 1,770,224 is valid, and claims 1, 2, 3, 4, 5, 6, 8, 12, 13, and 14 thereof are infringed by all corporate defendants named in suit No. Equity 735–M, and by defendant H. John Eastman in suit No. Equity 4–M, by each act of said parties defendant using the methods and apparatus referred to in this opinion and shown by the evidence and exhibits herein, and each and all of said defendants are enjoined from further infringement. Claim 18 of patent No. 1,770,224 is not infringed by any defendant herein.

Patent No. 1,830,345 is anticipated by patent No. 1,770,224 and is therefore not additionally invention.

The second suit, namely No. Equity 735–M, is dismissed as to defendant H. John Eastman because of the pendency, subject matter and decision herein of suit No. Equity 4–M against H. John Eastman alone.

Costs herein are assessed two-thirds thereof to complainant and one-third thereof to defendants jointly.

An accounting is ordered, and David B. Head, Esq., is appointed special master to hear, determine, and make the same, subject to review on exceptions. Costs of the accounting to be determined in final decree herein.

Findings of fact, conclusions of law and decree are ordered accordingly, and solicitor for complainant will prepare, serve, and present same under the rules.

Exceptions allowed respective parties upon all adverse rulings.